# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | |
|---|---|
| DINAH C. WASHINGTON,        ) | |
|                      ) | |
|        **Plaintiff,**        ) | |
|                      ) | |
| **v.**                         ) | **CAUSE NO. 1:15-cv-00189-SLC** |
|                      ) | |
| **COMMISSIONER OF SOCIAL**    ) | |
| **SECURITY,** *sued as Carolyn W.*    ) | |
| *Colvin, Acting Commissioner of SSA,*   ) | |
|                      ) | |
|        **Defendant.**       ) | |

## OPINION AND ORDER

Plaintiff Dinah C. Washington appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1]  (DE 1).  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Washington applied for DIB and SSI in August 2012, alleging disability as of February 12, 2012.[2]  (DE 11 Administrative Record ("AR") 228-35).  The Commissioner denied Washington's application initially and upon reconsideration.  (AR 160-85).  After a timely request, a hearing was held on October 7, 2013, before Administrative Law Judge William D. Pierson ("the ALJ"), at which Washington, who was represented by counsel; her husband; and a

---

[1] All parties have consented to the Magistrate Judge.  (DE 14); *see* 28 U.S.C. § 636(c).

[2] Washington had previously applied for DIB and SSI; however, her prior applications were denied after a hearing by an administrative law judge, and she did not appeal the decision.  (AR 24).

vocational expert, Marie Kieffer (the "VE"), testified.  (AR 38-86).  On January 17, 2014, the

ALJ rendered an unfavorable decision to Washington, concluding that she was not disabled

because despite the limitations caused by her impairments, she could perform her past work as a

hairdresser and a production assembler, as well as a significant number of other light jobs in the

economy.  (AR 24-33).  The Appeals Council denied Washington's request for review (AR 1-

16), at which point the ALJ's decision became the final decision of the Commissioner.  *See* 20

C.F.R. §§ 404.981, 416.1481.

Washington filed a complaint with this Court on July 24, 2015, seeking relief from the

Commissioner's final decision.  (DE 1).  Washington advances just one argument in her

appeal—that the ALJ improperly rejected the permanent restrictions assigned by her treating

physician, Alex Meyers, M.D.  (DE 19 at 8-10).

## II.  FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Washington was 52 years old (AR 124); had a high

school education (AR 44, 257); and possessed past work experience as a warehouse worker,

machine operator, and hairdresser (AR 298).  She alleges disability due to left shoulder

impingement syndrome/tendinopathy, left clavicular degenerative joint disease, fibromyalgia,

cervical degenerative joint disease, post left CS injection at carpal canal, post left shoulder

arthroscopy, post left shoulder distal clavicle excision, and renal dysfunction.  (DE 19 at 2).

### A.  *Washington's Testimony at the Hearing*

At the hearing, Washington, who is left handed, testified that she stopped working due to

problems with her left shoulder.  (AR 53).  Although her shoulder has improved over time, she

_____

[3] In the interest of brevity, this Opinion recounts only the portions of the 480-page administrative record
necessary to the decision.

still experiences aching in her shoulder, as well as intermittent numbness in her left arm. (AR 54-55). She can reach overhead with her left arm, but it is difficult to do so and causes her discomfort. (AR 55). Washington takes Cymbalta for her shoulder, which "calms it down," and also has prescription pain medication; however, she takes the pain medication sparingly (just three times in two weeks) and instead takes Tylenol. (AR 60).

Washington uses her left arm to clean her house, but she does so in spurts. (AR 56, 75-76). She used to be able to clean her house in one day; now it takes her several days. (AR 56). She uses her left arm to sweep, cook, and wash dishes; however, she uses her right arm to lift heavier items. (AR 57, 70). Stirring and gripping with her left hand causes her pain, so she makes simple meals. (AR 58). She can perform her own self care. (AR 70). She has difficulty holding her grandchildren longer than 30 minutes. (AR 59). She drives up to three times a week to go shopping and to doctor appointments, but her husband drives if they go out of town. (AR 43-44).

Washington also complained of pain in her low back and in her feet. (AR 60-61). She stated that her foot pain has improved since getting different shoes; when her foot pain does flare up, she can "walk it out" in about six minutes. (AR 61-62). She does not take pain medication for her feet. (AR 65). She had been walking up to three miles a day in an effort to lose weight, but her physician cut her back to 30 minutes on flat surfaces only. (AR 62-64). She props her feet up five hours a day. (AR 75). Washington takes pain medication for her back sparingly; about four times a month, she lies on a hard surface with a heating pad on her back and her feet up on a stool. (AR 64).

Washington also complained of fibromyalgia symptoms, stating that Cymbalta helps with

those as well.  (AR 64-65).  On a scale of one to 10, Washington rated her fibromyalgia pain as a "four" when taking Cymbalta and an "eight" when without Cymbalta.  (AR 66).  She complained of "memory fog," fatigue, difficulty sleeping, and pain when touched.  (AR 65-67, 69).  She takes medication to aid her sleep, which helps, but it also causes her some daytime drowsiness.  (AR 67-68).  She lies on the couch watching television for eight or nine hours a day.  (AR 67).  Washington also complained of neck pain, which causes a "tired feeling" and sometimes a burning sensation.  (AR 69).  In the past, she received injections for her neck, which were helpful.  (AR 69).

Washington estimated that she could walk up to 20 minutes and stand for 10 minutes before her back, left knee, and left foot start aching and swelling.  (AR 70-71).  She can lift five pounds with her left arm and 10 pounds with both arms.  (AR 71, 73).  She complained of difficulty gripping items and writing with her left hand.  (AR 73-74).  She uses pillows behind her back when she sits in a chair, and she puts her feet up.  (AR 72).  Sitting at a computer screen bothers her neck.  (AR 72).  She reported medication side effects of dizziness, drowsiness, rapid heart rate, poor eyesight, and headaches.[4]  (AR 68, 73).

### B.  Summary of the Relevant Medical Evidence

In July 2011, Washington saw Sarah Thomas, M.D., twice for complaints of pain in her low back, knees, and "all over."  (AR 400).  Injections in her left knee and elbow were administered at her first visit, and she was referred to physical therapy and prescribed non-steroidal anti-inflammatory drugs ("NSAIDs").  (AR 404).  Dr. Thomas put her off work for two weeks.  (AR 404).  At her second visit, Thomas stated that she had not taken the NSAIDs as

---

[4] Washington's husband also testified at the hearing, essentially corroborating her testimony.  (AR 77-80).

prescribed at her previous visit. (AR 400). She felt that she could not return to work and was considering applying for disability. (AR 400). On exam, her muscle strength and tone were normal, but she had tenderness in her elbows and in her lower spine. (AR 401).

In September 2011, Washington returned to Dr. Thomas complaining of pain in her feet and pain in her left shoulder which radiated down her left arm to her index finger. (AR 397). On exam, Washington exhibited full range of motion of her shoulder, but abduction and external rotation were painful; impingement was noted with abduction and flexion. (AR 398). She was assessed with lateral epicondylitis of the left elbow, low back pain, cervicalgia, and rotator cuff tendonitis. (AR 399). She was given an injection in her left shoulder and instructed to avoid lifting more than five pounds with her left arm for two weeks. (AR 399).

In January 2012, Washington saw Alex Meyers, M.D., a hand surgeon, for a three-year history of left arm pain. (AR 336). He noted that she had undergone five injections in her shoulder, several series of physical therapy, and an MRI. (AR 336). On exam, Washington had some tenderness to palpation over the greater tuberosity and pain with resisted external rotation. (AR 336). Her strength was 4+/5, limited only by pain. (AR 336). She had moderate tenderness over the acromio-clavicular joint, and cross body abduction was painful. (AR 336). A dorsomedial nerve compression test, Phalen's and reverse Phalen's tests, and a Tinel's test were all positive. (AR 336). An MRI showed supraspinatus anterior tendinopathy and edema that indicated at least a partial thickness tear, if not a full thickness tear. (AR 336). Associated acromioclavicular arthropathy and subacromial bursitis were present. (AR 336). Dr. Meyers's impression was left shoulder pain consistent with rotator cuff tendinopathy and peripheral compressive neuropathy with reported EMG positive carpal tunnel syndrome. (AR 336).

Because non-operative treatment had failed and the symptoms were affecting Washington's sleep and daily living activities, Dr. Meyers recommended Washington undergo an arthroscopic rotator cuff repair, as well as a left carpal tunnel release. (AR 336). However, he wanted to review her MRI and EMG reports before proceeding. (AR 337).

On February 2, 2012, Dr. Meyers performed a left shoulder arthroscopy and left shoulder distal clavicle excision on Washington. (AR 362). Because an EMG report was normal, Dr. Meyers opted to administer a cortisone injection into her left carpal tunnel, rather than perform a surgical release. (AR 362). Several days after surgery, Washington was doing well, demonstrating passive forward flexion to 120 degrees and 40 degrees external rotation. (AR 338). Dr. Meyers encouraged her to participate in physical therapy. (AR 338).

Later that month, Washington was seen by Dr. Thomas for followup. (AR 394). She was receiving physical therapy three times a week for her left shoulder. (AR 394). She complained of low back pain and "hurting all over," that she had pain upon touch, and that she had difficulty sleeping due to pain; Mobic helped reduce her pain. (AR 394). She demonstrated restricted range of motion in her left shoulder, and fibromyalgia trigger points were positive in all 18 regions. (AR 396). Dr. Thomas's impression was fibromyalgia, low back pain, left rotator cuff tendonitis and subacromial bursitis, and left carpal tunnel syndrome. (AR 396).

In March 2012, Washington saw Eugene MacDonald, M.D., a podiatrist, for heel pain when weight bearing. (AR 378). He indicated that Washington could return to work on May 2, 2012, but must avoid prolonged standing and any squatting, bending, stooping, or using ladders. (AR 382).

Also in March 2012, Washington returned to Dr. Thomas for followup on her plantar

fasciitis.  (AR 391-93).  She had been prescribed an orthotic and medication, but had stopped taking at least one medication on her own; she was still participating in physical therapy.  (AR 391).  She also complained of tightness in her back and shoulder muscles, and she continued to have pain and restriction of movement in her left shoulder.  (AR 391).  She complained of two-day "flares" in her pain, where she hurts all over and stays in bed.  (AR 391).  Upon exam, 13 of 18 fibromyalgia trigger points were positive.  (AR 392).  Dr. Thomas adjusted her medications and recommended that she perform stretches and apply heat.  (AR 393).

During a March 26, 2012, appointment, Dr. Meyers noted that Washington was seven weeks post surgery, that she was progressing in therapy, and that her pain was improving.  (AR 339).  She demonstrated active flexion to 130 degrees, active abduction to 120 degrees, external rotation to 70 degrees, and internal rotation to the lumbar spine; she demonstrated good cuff strength.  (AR 339).  Dr. Meyers instructed Washington to continue therapy, stating that passive range of motion exercises with progressive strengthening would help to reduce her shoulder stiffness.  (AR 339).

On April 23, 2012, Washington told Dr. Meyers that she had good days and bad days and that a Medrol dosepak had helped her significantly.  (AR 340).  She had used all of the physical therapy visits afforded by her insurance and was performing a home exercise program.  (AR 340).  Dr. Meyers and Washington agreed that she was sufficiently improving from week to week and that she did not need an injection or an MRI.  (AR 340).  She demonstrated active flexion to 140 degrees with pain after 90 degrees, active abduction to 130 degrees with pain after 90 degrees, external rotation to 70 degrees, and internal rotation to the buttock; she had 4+/5 cuff strength.  (AR 340).  Dr. Meyers indicated that Washington was doing well for being 10 weeks

post shoulder arthroscopy.  (AR 340).  He planned to see her back in a few weeks and stated that he may release her to return to work at that time.  (AR 340).

On May 16, 2012, Dr. Meyers wrote that Washington was doing well post shoulder capsulectomy and decompression.  (AR 341).  She still had some limitations overhead with respect to discomfort, but overall her functional arc of motion was well maintained, and she had good cuff strength throughout.  (AR 341).  He instructed her to continue her home exercise program for three to six months and to call him if she reached a plateau; she was to return only as needed.  (AR 341).  Dr. Meyers stated that he thought it would be in Washington's best interest "to limit herself overhead and to give her a permanent overhead lifting restriction."  (AR 341).  In that regard, he completed a "Patient Work/School Status" form, assigning Washington the following permanent restrictions with respect to her left upper extremity:  no use above the shoulder; no repetitive pushing, pulling, grasping, or twisting; and no lifting over two pounds.  (AR 371).  Although there are no further treatment notes from Dr. Meyers, two additional "Patient Work/School Status" forms dated May 30, 2012, and July 18, 2012, are of record, reiterating the same permanent restrictions.  (AR 364, 366).

Also in May 2012, Washington saw Dr. Thomas for back pain that was radiating to her left hip.  (AR 388-90).  Washington denied any neck pain; she was working on improving the range of motion of her left shoulder, but it was still restricted.  (AR 388).  Her muscle strength and tone were normal.  (AR 389).  She received another hip injection.  (AR 390).

In July 2012, Washington was seen by Dr. Thomas for left heel pain, but she denied any pain in other joints.  (AR 385-86).  She had started exercising and had felt much better until her heel flared up.  (AR 385).  She demonstrated 5/5 strength in all muscles and full range of motion

in all extremities.  (AR 386).  For Washington's left heel pain, Dr. Thomas recommended icing, stretching exercises, and a night splint.  (AR 387).  As to Washington's fibromyalgia, Dr. Thomas encouraged her to keep exercising as much as her heel would allow, noting that the exercise was causing her to feel better.  (AR 387).

Dr. MacDonald saw Washington for her heel pain several times in June and July 2012. (AR 372-76).  By the end of July, Washington reported to Dr. MacDonald that her left heel had improved and was just "a little sore."  (AR 372).

In September 2012, Washington donated a kidney to a family member.  (AR 456).

In October 2012, Joshua Eskonen, D.O., a state agency physician, reviewed Washington's record and concluded that she could lift 10 pounds frequently and 20 pounds occasionally; stand or walk up to six hours in an eight-hour workday; sit for six hours in an eight-hour workday; perform unlimited pushing and pulling within the lifting restrictions; and occasionally balance, stoop, kneel, crouch, crawl, and climb.  (AR 132-33).  In December 2012, R. Bond, M.D., another state agency physician, reviewed Washington's record and assigned the same limitations.  (AR 148-49).

In February 2013, Washington returned to Dr. Thomas after a lengthy absence; she had lost her job and her health insurance.  (AR 456).  She had been exercising, doing zumba twice a week, and walking three miles a day on a treadmill; however, she was having difficulty with pain in her neck and left hip and knee.  (AR 456).  She was taking certain medications just "off and on."  (AR 456).  On a scale of one to 10, she rated her pain as a "three" and her fatigue as a "four."  (AR 456).  She demonstrated normal muscle strength and full range of motion in her extremities; however, 16 of 18 fibromyalgia trigger points were positive.  (AR 457).  Dr. Thomas

administered several injections, encouraged stretching and aerobic exercise regimen, and prescribed Cymbalta and Tramadol.  (AR 458).

In March 2013, Washington was seen by Susan Draves, a nurse practitioner at the Family Medicine Center, for followup on her hypertension.  (AR 445-46).  She demonstrated normal range of motion in all extremities, and no medication side effects were noted.  (AR 442-43, 437).

In April 2013, Washington reported that she was feeling much better since losing weight and taking Cymbalta.  (AR 453).  She was exercising and had lost 12 pounds since her last visit.  (AR 453).  She again rated her pain as a "three" and her fatigue as a "four."  (AR 454).  She demonstrated full range of motion in all extremities, but reported pain with abduction of her shoulders bilaterally.  (AR 454-55).  Dr. Thomas assessed that Washington's myofascial pain syndrome was much better with the addition of Cymbalta and recommended that she continue exercising.  (AR 455).  In May 2013, Washington complained of increasing cramping pain in her knees, calves, and left hip, and her medications were adjusted.  (AR 463).

In July 2013, Washington saw Dr. Thomas for a routine followup on her left knee pain, which she rated as a "four."  (AR 460).  Her symptoms worsened upon weight bearing, but improved with NSAIDs.  (AR 461).  She exhibited full range of motion of her extremities, but reported pain with abduction of her left shoulder and mild tenderness in her left knee.  (AR 462). Washington was found to have a renal insufficiency, and thus, Dr. Thomas prescribed a Medrol dose pack, rather than NSAIDs, together with icing and stretching exercises.  (AR 462).

In September 2013, Washington told Ms. Graves at the Family Medicine Center that she was doing well and was without complaints; she denied any medication side effects.  (AR 473).  She had normal range of motion in all extremities, but complained of fibromyalgia pain.  (AR

474).  Ms. Graves encouraged Washington to try water exercises.  (AR 474).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits."  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### IV.  ANALYSIS

*A.  The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

11

mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.* (citation omitted).  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

*B. The Commissioner's Final Decision*

On January 17, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 24-33). The ALJ noted at step one of the five-step analysis that Washington had not engaged in substantial gainful activity since her alleged onset date. (AR 26). At step two, the ALJ found that Washington had the following severe impairments: fibromyalgia, bursitis, residuals of left shoulder surgery, cervical degenerative joint disease, and recent renal dysfunction. (AR 27).

At step three, the ALJ concluded that Washington did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 27-28). Before proceeding to step four, the ALJ determined that Washington's symptom testimony was not credible, and the ALJ assigned her the following RFC:

> [T]he claimant has the [RFC] to perform light work . . . except she can sit 6 of 8 hours, stand and/or walk 6 of 8 hours, lift and carry 10 pounds frequently and 20 pounds occasionally, cannot climb ladders, ropes, and scaffolds; and can occasionally climb ramps and stairs.

(AR 28).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Washington could perform her past relevant work as a hairdresser and production assembler. (AR 32). Alternatively, the ALJ found that because the additional limitations assigned in the RFC had little to no effect on the occupational base of unskilled light work, Washington was not disabled under grid rules 202.13 through 202.15. (AR 33). Therefore, Washington's applications for DIB and SSI were denied. (AR 33).

*C. The RFC Assigned by the ALJ Is Supported by Substantial Evidence*

Washington's sole argument on appeal is that the ALJ improperly rejected the permanent restrictions assigned by Dr. Meyers with respect to her left upper extremity. To review, these restrictions were no use above the shoulder; no repetitive pushing, pulling, grasping, or twisting; and no lifting over two pounds. (AR 364, 366). Having considered the record and the parties' arguments, the Court finds that the RFC assigned by the ALJ is supported by substantial evidence.

The Seventh Circuit Court of Appeals has explained that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citation omitted); *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner applies the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *See Books*, 91 F.3d at 979; 20 C.F.R. §§ 404.1527(c), 416.927(c). The

Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1545(e), 416.945(e); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment."). The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC assessment:

> is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545, 416.945. Thus, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." (citing 20 C.F.R. § 404.15279d)); *see* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996).

Here, the ALJ thoroughly considered the permanent restrictions assigned by Dr. Meyers, penning four paragraphs about them. (AR 27-31). In doing so, the ALJ observed that the restrictions were inconsistent with other material evidence of record. (AR 27, 29, 31). Upon weighing the evidence, the ALJ concluded that the restrictions were entitled to little weight for the following reasons: (1) Washington's ability to use her left upper extremity improved after

15

May 2012; (2) Tinel's and Phalen's signs were negative after surgery; (3) examinations after May 2012 revealed normal strength in her hands and arms and full range of motion in her fingers and elbows bilaterally with no swelling or synovitis; (4) Washington saw Dr. Meyers for about four months, and the limits he assigned are not supported by treatment notes for 12 months in duration; and (5) Washington did not complain of any carpal tunnel syndrome symptoms or neuropathy in her left arm to Dr. Meyers after May 2012. (AR 27-31). Succinctly, the ALJ stated: "While [the restrictions] may have been an accurate reflection of the claimant's limits for a few months after her left shoulder surgery, [they] do[] not accurately reflect the claimant's residual functional capacity 12 months in duration." (AR 30).

Washington challenges the ALJ's rationale for rejecting the permanent restrictions assigned by Dr. Meyers. First, she asserts that Dr. Thomas observed in both April and July 2013 that she experienced pain with shoulder abduction (AR 454-55, 462), but that the ALJ selectively ignored these findings. Second, Washington argues that the ALJ "played doctor" by making a medical judgment beyond his ken in rejecting the permanent restrictions. And third, Washington contends that the ALJ failed to give due weight to Dr. Meyers's speciality as a hand surgeon when considering the checklist factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c).

With respect to her first argument, Washington is correct that the ALJ did not specifically discuss Dr. Thomas's observation that Washington reported "pain with abduction" of her shoulders bilaterally in April 2013 and with respect to her left shoulder in July 2013. (AR 454-55, 462). "The ALJ's failure to address these specific findings, however, does not render his decision unsupported by substantial evidence because an ALJ need not address every piece of evidence in his decision. The ALJ need only build a bridge from the evidence to his

conclusion." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (citations and internal quotation marks omitted); *see also Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). Here these two observations, standing alone, do not materially undermine the bulk of evidence supporting the ALJ's observation that Washington's use of her left arm improved after May 2012, as she consistently demonstrated full upper extremity range of motion and strength at medical visits from July 2012 to September 2013. (*See, e.g.*, AR 386, 443, 454, 457, 462, 474). Furthermore, the April 2013 note indicated that abduction was painful *bilaterally*, which tends to undercut Washington's assertion that her pain was attributable to her history of left shoulder surgery. (AR 454-55). Consequently, on the record presented, the Court cannot conclude that the ALJ unfairly evaluated the record by not expressly discussing this evidence.

Next, Washington argues that the ALJ "played doctor" by making a medical judgment beyond his ken when he assigned little weight to the permanent restrictions assigned by Dr. Meyers. Indeed, "[a]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (citations omitted)). Here, however, the ALJ did not "play doctor" by improperly interpreting medical evidence. Rather, the ALJ considered the permanent restrictions for purposes of determining Washington's RFC—a responsibility which is reserved to the Commissioner. 20 C.F.R. §§ 404.1545(e), 416.945(e).

In that regard, "[t]he ALJ is charged with making an RFC determination that reflects the *entire* record, not just one doctor's opinion." *Lemere-Jackson v. Colvin*, No. 3:13-cv-912-CAN, 2014 WL 4656567, at *8 (N.D. Ind. Sept. 17, 2014) (emphasis added). Accordingly, an ALJ does not impermissibly "play doctor" when defining what limitations should be included in and

excluded from a claimant's RFC.  *Id.*; *see Rudicel v. Astrue*, 282 F. App'x 448, 453 (7th Cir.

2008) (rejecting the claimant's argument that the ALJ impermissibly "played doctor" by

affording more weight to the limitations opined by the state agency physicians than the

limitations opined by her treating specialist); *Jones v. Colvin*, No. 11 C 1608, 2014 WL 185087,

at *11 (N.D. Ill. Jan. 13, 2014) (concluding that the ALJ did not "play doctor" by failing to adopt

physicians' opinions of the claimant's RFC, where the ALJ offered adequate reasons for

rejecting their conclusions).

In considering Dr. Meyers's opinion, the ALJ observed—and correctly so—that the

permanent restrictions were inconsistent with the limitations opined by Dr. Eskonen in October

2012 and by Dr. Bond in December 2012, indicating that Washington could lift 10 pounds

frequently and 20 pounds occasionally and perform unlimited pushing and pulling.  The ALJ

also viewed the permanent restrictions as inconsistent with, and unsupported by, the physical

findings at Washington's visits to Dr. Thomas and the Family Medicine Center from July 2012

to September 2013, which consistently reflected normal upper extremity range of motion and

strength.[6]  In the face of these inconsistencies, the ALJ correctly concluded that Dr. Meyers's

opinion was not entitled to controlling weight.  *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th

Cir. 2006) (explaining that the "treating physician rule" directs the ALJ to give controlling

weight to a treating physician's opinion only if it is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial

evidence").

_____

[6] In fact, Washington testified at the hearing that she could lift five pounds with her left arm and 10 pounds with both arms (AR 71, 73), and thus, even her own testimony is inconsistent with the two-pound lifting restriction assigned by Dr. Meyers.

Once an ALJ determines that a treating physician's opinion is not entitled to controlling weight, the Commissioner must apply the factors articulated in 20 C.F.R. §§ 404.1527(c) and 416.927(c) to determine the proper weight to apply to the opinion. *See Henke v. Astrue*, 498 F. App'x 636, 639 (7th Cir. 2012) ("[T]he ALJ need not blindly accept a treating physician's opinion—she may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record."). An ALJ need not explicitly weigh every factor when analyzing what weight to attribute to the treating source's opinion. *Id.* at 640 n.3. Here, the ALJ adequately applied the factors in weighing Dr. Meyers's opinion. Although Washington suggests otherwise, the ALJ did indeed consider that Dr. Meyers was Washington's treating upper extremity specialist. (AR 28). Yet, the ALJ ultimately found it more significant that Dr. Meyers had treated Washington for a relatively brief period of time—only about four months—and that he had not seen her since mid-2012. (AR 27, 29-31). The ALJ also considered that Dr. Meyers's opinion was not consistent with the limitations opined by Drs. Eskonen and Bond, and neither consistent with, nor supported by, the normal physical findings documented at Washington's visits to Dr. Thomas and the Family Medicine Center from July 2012 to September 2013.[7] (AR 27-31).

"[W]hen the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict." *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849 (N.D. Ill. 2006) (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). In that vein, the ALJ confronted, and then resolved, the conflict between the opinions of Dr. Meyers and Drs. Eskonen

---

[7] The Court notes that when Dr. Meyers assigned the restrictions in May 2012, Washington was still working on improving her range of motion and had some difficulty with overhead discomfort. (AR 341, 388). Within two months, however, Washington was demonstrating full range of motion of her left shoulder at medical appointments. (AR 386).

and Bond concerning Washington's upper extremity limitations. The ALJ articulated several good reasons for discounting the permanent restrictions assigned by Dr. Meyers, and Washington does not challenge these reasons with any particularity. These reasons include that: (1) Dr. Meyers treated Washington for only about four months; (2) Washington's left upper extremity function improved after Dr. Meyers assigned the restrictions; (3) Washington demonstrated full upper extremity range of motion and strength from July 2012 through September 2013; and (4) Washington no longer complained of any carpal tunnel syndrome symptoms or neuropathy in her left arm to Dr. Meyers after May 2012. Therefore, because the ALJ provided a "sound explanation" for assigning little weight to the permanent restrictions assigned by Dr. Meyers, the ALJ adequately bore his responsibilities when considering the opinion.[8] *See Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." (citations omitted)); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as he minimally articulate[s] his reasons for crediting or rejecting evidence of disability." (alteration in original) (citations and internal quotation marks omitted)).

 In sum, because the permanent restrictions assigned by Dr. Meyers were inconsistent

---

[8] Additionally, Washington suggests that Drs. Eskonen and Bond never saw the permanent restrictions assigned by Dr. Meyers because in their documentation they indicated there was no "opinion evidence" from any source. (AR 133, 149). But Dr. Meyers's treatments records, including the restrictions, were received by the Social Security Administration on August 24, 2012, and the records were characterized as "medical evidence of record," rather than "opinion evidence." (AR 130, 138, 146, 154, 364, 366). Consequently, it is reasonable to infer that Dr. Eskonen considered all of Dr. Meyers's records, including the restrictions, when reviewing the record in October 2012, and that Dr. Bond did so as well in December 2012.

with other opinion evidence and substantial medical evidence of record, the ALJ properly denied the opinion controlling weight. After determining that the opinion was not entitled to controlling weight, the ALJ adequately considered the opinion under the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) and articulated several good reasons for assigning it little weight. As such, the ALJ's decision to discount the permanent restrictions assigned by Dr. Meyers is adequately articulated and supported by substantial evidence. The Court will not engage in reweighing the evidence at this juncture. *Clifford*, 227 F.3d at 869 (The Court "do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner's."). Accordingly, the Commissioner's final decision will be AFFIRMED.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Washington.

SO ORDERED.

Entered this 14th day of September 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge